UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-22655-CIV-HIGHSMITH

DIANA SANCHEZ,

        Plaintiff,

v.

MIAMI-DADE DEPARTMENT OF
CORRECTIONS & REHABILITATION,

        Defendant.

_____/

<u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

THIS CAUSE came before the Court upon the Motion for Summary Judgment [DE 13] filed by Defendant, Miami-Dade Department of Corrections and Rehabilitation (the "Department").

The Plaintiff, Diana Sanchez, instituted the instant action against the Department, asserting three causes of action for intentional employment discrimination based on sex and national origin. In Count I, Plaintiff alleges discrimination under Title VII of the Civil Rights Act of 1963 and 42 U.S.C. §2000e-2 ("Title VII"), in that the Department's failure to promote the Plaintiff to a supervisory position was based on Plaintiff's sex and national origin. In Count II, Plaintiff alleges the same allegations raised in Count I, but under the Florida Civil Rights Act of 1992 and Florida Statutes section 760.10 ("FCRA"). In Count III,

Plaintiff alleges discrimination under the Equal Employment Act of 1963 and 29 U.S.C. §206(d), claiming that she was paid wages at a rate less than the rate at which the Department pays wages to employees of the opposite sex for equal work on jobs requiring equal skill, effort, responsibility, and performed under similar working conditions.  The Department seeks summary judgment as to all three counts.

Upon review of the parties' arguments, relevant case law, and the record, this Court concludes that the Department's motion should be GRANTED and summary judgment entered for the Department as to all counts in Plaintiff's complaint.

## FACTS

Defendant correctly observes in its Reply to Plaintiff's Response and Memorandum of Law in Opposition to the Department's Motion for Summary Judgment that Plaintiff has failed to directly refute the facts set forth in the Department's statement in support of the Motion as required by the Local Rules.

Under Local Rule 7.5(B), "[t]he papers opposing a Motion for Summary Judgment shall include a memorandum of law, necessary affidavits, and a single statement of material facts as to which it is contended that there exists a genuine issue be tried." Also under Local Rule 7.5(D), "[a]ll material facts set forth in the statement required to be served by the opposing party will be deemed admitted unless controverted by the opposing party's statement, if and only to the extent supported by specific references to the pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court."

Plaintiff did not comply with the Local Rules. Because of Plaintiff's noncompliance with the Local Rules the Department's statement of facts may be deemed admitted. <u>Monsanto Company v. Campuano</u>, 206 F. Supp.2d 1252, 1256-57 (S.D. Fla. 2002); <u>Henry v. City of Tallahassee</u>, 216 F. Supp.2d 1299, 1308-9 (N.D. Fla. 2002). Nonetheless, in order to address the Motion on the merits, the Department's statement of facts shall be deemed admitted only to the extent it is not controverted by the admissible facts presented by Plaintiff's deposition testimony.

     A.     Failure to Promote

Plaintiff is a female of Colombian national origin. (Sanchez Affidavit). She began working for the Department in 1989 as a Property Room Custodian, was promoted to Property Room Supervisor in 1994, and took a voluntary demotion to her current position of Labor Supervisor 3 in August 1998. (Plaintiff's Dep. at 8-9). In March 2004, the County announced an opening for the position of Maintenance Supervisor in the Corrections Department, which was advertised in local newspapers and posted at various worksites and the County's website. (Def. Ex. 1). The minimum qualifications for the position were high school diploma or GED and five years of skilled trades experience to include supervisory experience. (Def. Ex. 2; Pl's Dep. at 73, 75-76). After screening the applications received, Simon Waterman, the Acting Commander of the Facilities Management Bureau, determined that twenty-two applicants met the minimum qualifications for the position. (Waterman Affidavit at DE 24). Those qualified candidates included Jonathan Buckhalt, a welder for the

Department; Jose De La Mata, employed with the Department as a locksmith; and Aurelio Rodriguez, Plaintiff's husband, who is also a locksmith with the Department.  (Id.).

Buckhalt's resume showed that he had over five years of skilled trades experience, including two years with the Department as a welder, part-time work as a welder for two private companies between 1997 and the time of his application, and three years training as a welder at a vocational institute. (Waterman Aff.; Def. Exh. 3).  He had supervisory experience through a previous job with a private employer, where he coordinated three supervisors overseeing 45 laborers and was responsible for handling payroll, purchasing and the distribution of tools and material. (Id.) He also held State certification as a welder and in the handling of hazardous materials. (Id.)

De La Mata's resume showed that he had a high school diploma, with an additional two years of training in electronics, and 24 years of maintenance engineering experience. (Waterman Aff.; Def. Exh. 4). At the time he applied, he had worked for the Department for eight years as a locksmith. (Id.) Before joining the County, he worked as a maintenance supervisor at a hospital for six years and as a locksmith and maintenance engineer for an additional three years. (Id.)  He also held State certification as a locksmith. (Id.)

Plaintiff's resume lists her previous jobs as a Labor Supervisor 3 and a Property Room Supervisor for the Department and as an office administrator at an auto dealership where she managed finance and closing documents for the purchase of vehicles. (Waterman Aff.; Def. Exh. 5). None of these jobs included trades experience. (Id.; see Plaintiff's Dep. at 64, 67).

-4-

The resume mentions that Plaintiff has three years experience as a locksmith, but it does not show where she worked in that capacity. (Def. Exh. 5; see Plaintiff's Dep. at 68-70). At her deposition, Plaintiff explained that she did not obtain her certification or actually begin working as a locksmith until 2004, around the same time she applied for the promotion. (Plaintiff's Dep. at 27-28, 69).

Plaintiff acknowledges that the resume she originally submitted as part of her application did not reflect the required minimum of five years of skilled trades experience. (Id. at 67-68). She submitted a revised resume to the County's Employee Relations Department a couple of weeks after she first applied, however, on which she added a previous job at "Best Painters, Inc." (Def. Exh. 8). Waterman did not see the revised resume before he made his initial decision to reject her application. (Waterman Aff). The revised resume describes Plaintiff's job at the paint company as "Secretary, Inventory Control, Loss Prevention." (Id.)  At her deposition, Plaintiff testified that the job did not actually involve the trade of painting; she was employed in the office and was primarily responsible for purchasing paint and other supplies for retail sale at the company store. (Plaintiff's Dep. at 65, 66-67). The only painting she did was on an occasional Saturday, when she would match paint colors on metal samples in the course of selling paint to automobile body shops. (Id. at 66). She had no other experience in the trades. (Id. at 71).

Waterman determined that Plaintiff did not meet the qualifications for the position because her resume did not show the required five years of skilled trades experience.  (Id.;

Def. Ex. 5). Another applicant, Edward Woodberry ("Woodberry"), was also rejected for the same reasons as the Plaintiff. (Waterman Affidavit; Def. Ex. 6).

Out of the twenty-two applicants that met the requirements for the position, fifteen accepted the invitations for an interview. (Waterman Affidavit; Pl. Dep. at 7-8). The interviews were conducted by a panel of three supervisors: John Menendez (Hispanic Male), Olive Oddman-Hamilton (Black Female), and Simon Waterman (White Male). (Id.). The panel conducted "structured interviews", according to County employee promotion and selection procedures. (Waterman Affidavit; Def. Ex. 2; Pl. Dep. at 75-76). The interview consisted of questions drafted in advance and designed to be relevant to the position. (Id.). Each candidate was asked the same questions in the same order, and were scored on how well their answers matched the correct answers. (Waterman Affidavit). The highest score was obtained by Buckhalt with 279, Rodriguez was second with a score of 273, and De La Mata was third with a score of 253. (Id.; Def. Ex. 9). Before the Department Director was able to act on the Panel's recommendation, Plaintiff complained that she should have been interviewed. (Pl. Dep. at 82-83). The Department's personnel bureau decided that the panel should have interviewed all internal candidates, including Plaintiff and Woodberry, regardless of whether they actually met the minimum qualifications for the position. (Id.; Kelly Affidavit at DE 24; Waterman Affidavit; Def. Ex. 10). Accordingly, the panel's recommendation was rejected and the interview panel was directed to start the selection process over. (Id.).

-6-

The same interview panel was reconvened and a new set of questions and answers were developed. (Waterman Aff.). The panel invited Plaintiff, Woodberry, and all those applicants who had scored 80% or better on the first interview. (Waterman Aff.). Plaintiff's husband was invited to this second interview and was notified of this interview a week or so before it was scheduled. (Pl. Dep. at 87, 142).  Plaintiff's husband mentioned this interview to Plaintiff, to which she replied, "Probably I'm not getting interviewed again." (Id. at 142-43).  Plaintiff did not call the Department to determine if she was going to be interviewed. (Id. at 143).  Plaintiff was informed about the interview on the same day it was scheduled. (Id. at 139-40). Plaintiff was not notified of the interview before because Plaintiff was on vacation the week prior to the interview.  (Id.).  Plaintiff admits that she did not need to study for the interview because she had been doing the work for years and already knew everything she needed to know.  (Id. at 76, 90).

Based on the second interview, the panel again ranked Buckhalt first with a high score of 218,  De La Mata and Angel Cabrera were tied at second with scores of 158, Woodberry fourth with 107, Plaintiff fifth with a score of 92, and Plaintiff's husband sixth with a score of 60.  (Waterman Aff.; Def. Ex. 12). The panel recommended that the Department appoint one of the top three scoring candidates.  (Id.).

In November 2004, the Department Director appointed Buckhalt to the Maintenance Supervisor position. (Kelly Aff.)

B.      Equal Pay

Plaintiff is employed as a Labor Supervisor 3. (Pl. Dep. at 6).  The Labor Supervisor 3

Classification is in the County's Government's Supervisors Association ("GSA") bargaining

unit and is governed by that union's collective bargaining agreement.  (Id. at 13-14).

Plaintiff's job involves the supervision of a labor crew comprised of inmates in the County

Jail, who perform tasks such as waste collection, landscaping and grounds maintenance,

cleaning of assigned areas, and washing, folding and delivering laundry.  (Id. at 35; Def. Ex.

13).  The Labor Supervisor 3 job description states that they are responsible for conducting

daily inspections of their crew's work, issuing supplies, maintaining records of personnel and

materials, and ensuring compliance with security rules.  (Def. Ex. 13, 14).   They are also

expected to participate in actual physical tasks alongside the members of the crew.  (Def. Ex.

14; Pl. Dep. at 34).  Plaintiff possesses a certification as a locksmith, but her job does not

require such certification, nor does she perform such duties.  (Pl. Dep. at 28).

On various occasions between 2000 and 2004, Plaintiff was assigned to the office at

the stockade or the Metro West facility and performed duties of a more clerical or

administrative nature. (Id. at 40-43). Her duties consisted primarily of answering phones and

issuing service tickets for repairs. (Id. at 40).  While working in the office, Plaintiff was

trained to do purchase orders, order supplies and keep track of the attendance of trades

workers. (Id. at 41). The same duties are performed by employees in the classification of

Clerk 3, which is paid less than a Labor Supervisor 3. (Id. at 41.; Def. Ex. 15, 16; Waterman

-8-

Aff.; Serrano Affidavit). Plaintiff alleges that she was acting as a supervisor, but her duties did not include such significant supervisory tasks as evaluating employees, inspecting their work to ensure compliance with applicable codes and professional standards, recommending raises, awarding overtime, or counseling and disciplining employees. (Pl. Dep. at 44-46, 50-53).

Between 1992 and 2004, David Serrano was employed as a Maintenance Supervisor. (Serrano Aff.). In 2004 he was promoted to the position of Facilities Manager. (Id.). As a Maintenance Supervisor, his duties included the supervision of skilled trades workers. (Id.; Def. Ex. 17, 18). He was responsible for calculating the time, materials and costs needed to complete projects and for inspecting his subordinates' work to ensure compliance with Departmental requirements and applicable building codes. (Id.). He conducted annual employee performance evaluations for those he supervised, recommended whether they should receive merit pay increases, counseled and disciplined employees and assigned overtime. (Serrano Aff. See Pl Dep. at 131). The Maintenance Supervisor classification is also in the GSA bargaining unit. (Serrano Aff.).

Before his promotion to Maintenance Supervisor, De La Mata was employed as a Locksmith and was required to possess a State certification.. (De La Mata Affidavit). His primary job duties included fixing and replacing locks. (Id.; Def. Ex. 19, 20). As a locksmith, he was a member of the American Federation of State, County, and Municipality Employees ("AFSCME")  bargaining unit and subject to the terms of that union's collective bargaining agreement. (De La Mata Aff.).  Like Plaintiff, he was occasionally required to perform such

administrative tasks as handing out service tickets, ordering supplies and tracking attendance. (Id.).  He did not receive any increase in pay when he performed such tasks. (Id.).

James Kirkland is employed as a Plumbing Supervisor and has occasionally served as an Acting Facilities Manager. (Kirkland Aff.). He possesses a Master Plumbers license and is skilled in all aspects of the trade. (Id.; Pl. Dep. at 130). He supervises a crew of plumbers, all of whom have at least a journeyman's plumber's license. (Kirkland Aff.; Def. Ex. 21). He assigns and inspects the work of his subordinates and is responsible for conducting their written performance evaluations, recommending whether they should receive pay increases, counseling and disciplining them and assigning overtime. (Id.).

James Zuniga is employed as a Master Electrician. (Zuniga Aff.).  Zuniga possesses an electrician's license and is responsible for performing skilled electrical work and supervising a crew of other licensed electricians. He is responsible for assigning and inspecting the work of his subordinates and for conducting their written performance evaluations, recommending whether they should receive pay increases, counseling and disciplining them and assigning overtime. (Id.).

Edward Woodberry is a male employee who, like Plaintiff, is employed as a Labor Supervisor 3. (Woodberry Dep. at 22). When he first assumed the position in February 2000, he was assigned to work in the laundry room supervising inmate labor, just like Plaintiff. (Id. at 6, 23). He later took over Plaintiff's assignment assisting the facilities manager at the

-10-

stockade and performed such duties as issuing service tickets, ordering supplies, and keeping track of the attendance and performance of trades workers. (Id. at 7-8, 10-12, 23-24). While performing these duties, he continued to be paid at the Labor Supervisor 3 pay rate just like Plaintiff. (Id. at 23).

      C.    Out of Class Pay

Between February and April of 2004, Plaintiff was assigned to the Department's Metro West facility.  (Pl. Dep. at 131).  Her supervisor at the time was Emilio Palma, who was responsible for both Metro West and the Women's Annex. (Id.). Plaintiff filed a complaint alleging that she should have received out of class pay for this period of time. (Id. at 133).  The Bureau Commander informed Plaintiff that she could not be paid out of class because the Metro West Manager was still physically available and continued to visit and supervise the facility.  (Id.).

Under the GSA contract, employees may receive out of class pay if they are "specifically authorized and assigned by the Department Director or their designee to temporarily assume the duties of a higher pay classification for five consecutive workdays." (Def. Ex. 22).  Plaintiff did challenge the Commander's decision, as she had the right to do, by filing a grievance under the GSA collective bargaining agreement and pursuing it to arbitration.  (Id.).

Another employee, De La Mata received out of class pay for two weeks between January and February of 2005, while his supervisor was out on medical leave.  (De La Mata

Aff; Kelly Aff.).  De La Mata, however, did not receive out of class pay at any other time

between January 2004 and the present. (De La Mata Aff.; Kelly Aff.; Def. Ex. 23).

     D.     Remedies

Plaintiff filed a charge with the EEOC on April 18, 2005, alleging discrimination in

connection with the failure to promote her to the position of Maintenance Supervisor

between November 8, 2004 and February 1, 2005. (Def. Ex. 24; Pl. Dep. at 66). The EEOC

conducted an investigation of Plaintiff's allegation and concluded that the evidence it

obtained was insufficient to show a Title VII violation. (Def. Ex. 25).

SUMMARY JUDGMENT STANDARD

Fed. R. Civ. P. 56(c) authorizes summary judgment when the pleadings and

supporting materials show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986).  The court's focus in reviewing a

motion for summary judgment is whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law. Id. at 252; Bishop v. Birmingham Police Dep't, 361 F.3d 607, 609 (11th Cir.

2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the

absence of a genuine issue of material fact.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646

(11th Cir. 1997). Once the moving party satisfies this burden, the burden shifts to the party

-12-

opposing the motion to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. Celotex v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; See also Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001).  Thus, the party opposing summary judgment may not rest upon the mere allegations or denials of the pleadings, but must present sufficient evidence favoring the non-moving party for a jury to return a verdict in favor of that party. Id. at 249.

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-movant. Denney, 247 F.3d at 1181.  In determining whether to grant summary judgment, the court must remember that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Anderson, 477 U.S. at 255, 106 S. Ct. at 2513.

## ANALYSIS

A.    Counts I & II - Failure to Promote

Count I and Count II will be discussed simultaneously, as both counts allege discrimination for failure to promote, and in analyzing a discrimination claim under the FCRA, Florida courts use the same framework as claims brought under Title VII.  See, e.g.,

Hampton v. City of S. Miami, 186 Fed. Appx. 967, 970 n.1 (11th Cir. 2006) ("Federal case law

interpreting Title VII is applicable to cases arising under the FCRA."); Florida State Univ. v.

Sondel, 685 So.2d 923, 925, n.1 (Fla. 1st DCA 1996) ("Federal case law interpreting Title VII .

. . is applicable to cases arising under the Florida Act.")

       Title VII makes it unlawful for an employer "to limit, segregate, or classify his

employees or applicants for employment in any way which would deprive or tend to deprive

any individual of employment opportunities or otherwise adversely affect his status as an

employee, because of such individual's race, color, religion, sex, or national origin."  42

U.S.C. § 2000(e))(1964).  A claim of discrimination under Title VII may be proved through

either direct or circumstantial evidence.  Arrington v. Cobb County, 139 F.3d 865, 873 (11th

Cir. 1998).  In cases such as here, where direct evidence of employment is lacking, "we

analyze the claim under the McDonnell Douglas framework, which requires the plaintiff to

create an inference of discrimination through her prima facie case."  Springer v. Convergys

Customer Mgmt. Group, 509 F.3d 1344, 1347 (11thCir. 2007) (citing McDonnell Douglas

Corp. V. Green, 411 U.S. 792, 8022, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).  "Once the

plaintiff has made out the elements of the prima facie case,[1] the burden shifts to the

employer to articulate a non-discriminatory basis for its employment action."  Id. (citing

---

[1]In order to establish a prima facie case on the basis of a failure to promote, Plaintiff must
demonstrate that:  (i) that she belonged to a protected class; (ii) that she applied and was qualified for a
job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected;
and (iv) the position was filled with an individual outside the protected class.  McDonnell Douglas Corp.,
411 U.S. at 802.

Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).  If the employer proffers some legitimate, non-discriminatory reason for the promotion decision, the plaintiff must then show that this reason is merely pre-textual. Id. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id.

For purposes of this Motion for Summary Judgment, we will assume that Plaintiff has met her prima facie case, as this is a light burden, and the summary judgment standard requires this court to examine all evidence in a light most favorable to the non-moving party. See Holifield v. Reno, 115 F.3d 1555, 1561-1562 (11th Cir. 1997) (holding that establishing a prima facie case is a light burden). Thus, the burden shifts to the Department to provide a legitimate, nondiscriminatory reason for promoting Buckhalt, and later De La Mata, both males, over Plaintiff for the position of Maintenance Supervisor.  The Department's articulated reason was that Buckhalt and De La Mata were more qualified based on their performance in the structured interviews.  To support this assertion, the Department provided testimony and evidence, which the Plaintiff does not dispute, of the interview question forms and scores, which show that Plaintiff's overall score ranked fifth, below Buckhalt and De la Mata, who ranked first and second, respectively.

Now that the Department has rebutted the presumption of discrimination, "our inquiry proceeds to a new level of specificity, in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." Brooks v. County Comm'n

of Jefferson County, 446 F.3d 1160, 1162 (11th Cir. 2006) (internal quotations and citations

omitted).   To do so, Plaintiff must reveal "such weaknesses, implausibilities, inconsistencies,

incoherencies or contradictions" in the Department's reason for its actions "that a reasonable

factfinder could find them unworthy of credence."  Springer, 509 F.3d at 1348 (quotations

and citations omitted).  "However, a reason is not pretext for discrimination 'unless it is

shown both that the reason was false, and that discrimination was the real reason.'"  Brooks,

446 F.3d at 1163.

    To explain further, "[i]n the context of a promotion, a plaintiff cannot prove pretext

by simply arguing or even showing that [she] was better qualified than the [person] who

received the position [she] coveted.  A plaintiff must show not merely that the defendant's

employment decisions were mistaken but that they were in fact motivated by race."  Id.  It is

insufficient to merely question the wisdom of the employer's reasons, where those reasons

might motivate a reasonable employer.  Id.

    The issue, therefore, is not which employee was more qualified, but whether there

was such a disparity between Plaintiff's qualifications and those of Buckhalt and De la Mata,

that no reasonable factfinder could believe that Buckhalt's score would have or could have

been higher than that of Plaintiff.  See Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th

Cir. 2001) (holding that disparities in qualifications must be so great that a reasonable fact

finder could infer that employer was acting in a discriminatory manner).

Buckhalt's resume showed that he had over five years of skilled trades experience, including two years with the Department as a welder, part-time work as a welder for two private companies between 1997 and the time of his application, and three years training as a welder at a vocational institute. (Waterman Aff.; Def. Exh. 3).  He had supervisory experience through a previous job with a private employer, where he coordinated three supervisors overseeing 45 laborers and was responsible for handling payroll, purchasing and the distribution of tools and material. (Id.) He also held State certification as a welder and in the handling of hazardous materials. (Id.)

De La Mata's resume showed that he had a high school diploma, with an additional two years of training in electronics, and 24 years of maintenance engineering experience. (Waterman Aff.; Def. Ex. 4). At the time he applied, he had worked for the Department for eight years as a locksmith. (Id.) Before joining the County, he worked as a maintenance supervisor at a hospital for six years and as a locksmith and maintenance engineer for an additional three years. (Id.)  He also held State certification as a locksmith. (Id.)

Plaintiff's resume lists her previous jobs as a Labor Supervisor 3 and a Property Room Supervisor for the Department and as an office administrator at an auto dealership where she managed finance and closing documents for the purchase of vehicles. (Waterman Aff.; Def. Ex. 5). None of these jobs included trades experience. (Id.; see Pl. Dep. at 64, 67). The resume mentions that Plaintiff has three years experience as a locksmith, but it does not show where she worked in that capacity. (Def. Ex. 5; see Pl. Dep. at 68-70). At her deposition, Plaintiff

-17-

explained that she did not obtain her certification or actually begin working as a locksmith until 2004, around the same time she applied for the promotion. (Pl. Dep. at 27-28, 69).  Her revised resume added a previous job at "Best Painters, Inc." as "Secretary, Inventory Control, Loss Prevention." (Def. Ex. 8). At her deposition, Plaintiff testified that she was employed in the office and was primarily responsible for purchasing paint and other supplies for retail sale at the company store. (Pl. Dep. at 65, 66-67). The only painting she did was on an occasional Saturday, when she would match paint colors on metal samples in the course of selling paint to automobile body shops. (Id. at 66). She had no other experience in the trades. (Id. at 71).

Based on their backgrounds and employment histories, there are no disparities between the qualifications of Plaintiff versus those of Buckhalt and De La Mata that would permit a reasonable trier of fact to find pretext.

Plaintiff concedes that she has no reason to believe that the promotion decisions were based on anything other than the interview scores.  (Pl. Dep. 110).  She contends, however, that each of the three interview panel members misjudged her performance.  Our inquiry, however, "at the third stage of the McDonnell Douglas analysis of a promotion discrimination claim is not concerned with [Plaintiff's] belief that she was more qualified or whether we could conclude that she was better qualified than [Buckhalt or De la Mata]." Brooks, 446 F.3d at 1163-64 (citing Cooper v. S.Co., 390 F.3d 695, 744 (11th Cir. 2004), for the proposition that "plaintiff's reliance on her own belief that she was better qualified than promotee" and that "whether we could conclude [the plaintiff] was better qualified that [the

-18-

promotee] is not the issue here").  This view is consistent with those of our sister Courts, who have also consistently held that a plaintiff cannot prove that reliance on interview scores is a pretext simply by arguing that she is better qualified than the successful candidates.[2]

In her Response, Plaintiff argues that the thrust of her claim revolves around more than just scoring; that the entire process was fraught with manipulation, favoritism, and concealed assistance.  She asserts that the process was tainted from the beginning, and that Menendez and Waterman helped Buckhalt prepare for the interview.  However, the employees depositions do not support these allegations, and Plaintiff cites to no portion of Waterman's deposition in making this assertion. Menendez testified that he gave assistance to any candidate that asked, including Plaintiff's husband, Aurelio Rodriguez, and Roberto Mendoza, and gave them copies of the manuals.  (Menendez Dep., at 22-23, 25).  Buckhalt asked Menendez to work at the office to learn about purchase requests, and Menendez granted this request.  Plaintiff did not make any such requests.  Additionally, Plaintiff testifies she was aware that interviews were being re-conducted, and also that she did not receive notice because she was on vacation.  She admits that the late notice did not impact

_____

[2]See, e.g., Brooks v. Ameren UE, 345 F.3d 986 (8th Cir. 2003) (holding that an employer's proffered reason for not promoting employee, that employee had lower interview scores, was not a pretext for discrimination); Ghosh v. Indiana Dept. of Env'l Res., 192 F.3d 10087 (7th Cir. 1999) (where employee provided no facts suggesting interviewer scored him lower because of his national origin, fact that employee may have had more experience than successful candidate did not undermine employer's explanation that it based its decision on interview scores.

-19-

her performance.  (Pl. Dep., at 76, 87, 139-140, 142-143).  Thus, the allegations which
Plaintiff contends constitute the "thrust" of her claim cannot be found anywhere in the
record, and amount to nothing more than rumors and hearsay.  Of course, it is an elementary
rule of civil procedure that affidavits or depositions based on rumor or conjecture
inadmissable to defeat summary judgment. See FRCP 56(e), 28 U.S.C.A.  See, e.g., Corwin v.
Walt Disney Co., 475 F.3d 1239 (11th Cir. 2007) (holding that even on summary judgment, a
court is not obligated to take as true testimony that is not based upon personal knowledge);
Markel v. Board of Regents, 276 F.3d 906, 912 (7th Cir. 2002) ("A party to a lawsuit cannot
ward off summary judgment with an affidavit or deposition based on rumor or conjecture.");
Knight v. U.S. Fire Ins. Co., 804 F.2d 9 (2d Cir. 1986) ("Nor may a party rely on mere
speculation or conjecture as to the true nature of the facts to overcome a motion for
summary judgment.")

Thus, it is undisputed that both Buckhalt and De la Mata received higher interview
scores than Plaintiff, and Plaintiff has failed to put forth any evidence that discrimination
was the real reason for the Department's decision.  Nor has Plaintiff established that the
proffered reason was pretextual or "unworthy of credence."  Springer, 509 F.3d at 1348.
Accordingly, the Department is entitled to summary judgment in its favor as to Counts I and
II.

B.      Count III - Equal Pay

Interestingly, in her Response, Plaintiff makes no argument (and offers no evidence) in an effort to defeat the Department's summary judgment on her equal pay claim. Instead, she spends, literally, four sentences in support of her claim for out-of-class pay. While, it seems she has abandoned her Equal Pay Act claim, and while, the Department makes a seemingly valid argument regarding her "out of class" claim,[3] we will nonetheless address both claims, in an abundance of caution.

1. Equal Pay

Plaintiff's Complaint alleges that her male colleagues, namely David Serrano, James Kirkland, James Zuniga, and Jose De La Mata, were earning higher salaries for a comparable job. The relevant section of the Act states:

> [N]o employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a

---

[3]The Department argues that Plaintiff raises for the first time, in her Response to the Motion, specific allegations that she was underpaid on five isolated occasions between March 2003 and August 2004, during which she should have been paid for "out of class" work. The Department asserts that she did not make these specific allegation in her complaint, response to interrogatories or in her deposition, and should, therefore, not be permitted to raise them for the first time in response to a motion for summary judgment. In support, the Department cites to Gilmore v. Gates, McDonald and Co., 382 F.3d 1312 (11th Cir. 2004), which held that a non-moving party plaintiff may not "raise a new legal claim for the first time in response to the opposing party's summary judgment motion."

merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206 (d).   Thus, the Act authorizes employers to pay employees differently based on any differential other than sex.

It is undisputed that Serrano was employed as a Maintenance Supervisor until 2004, and in 2004 he was promoted to the position of Facilities Manager; De La Mata was employed as a Locksmith governed by the AFSCME collective bargaining agreement; Kirkland was employed as a Plumbing Supervisor and occasionally served as an Acting Facilities Manager; and Zuniga was Master Electrician.

In the instant case, there are several reasons to account for any pay differential between Plaintiff's pay and that of the other male employees she contends are paid more. First, Plaintiff is employed as a "Labor Supervisor 3," whereas the other employees were categorized in a different category of the GSA bargaining unit. (Pl. Dep. at 6).  Second, the other employees had significant supervisory duties which accompanied their job description, which Plaintiff did not.  She did not evaluate other employees, inspect their work to ensure compliance with codes, recommend raises, award overtime, or discipline employees.  Lastly, the four other male coworkers who received higher pay than Plaintiff also had different qualifications.  Thus, the employer here, the Department, has asserted a "differential based on any other factor than sex" and has not violated the Equal Pay Act.

-22-

2. <u>Out-of-Class Pay</u>

Plaintiff also alleges that she should receive "out of class pay" for the time she was assigned to Metro West Facility, specifically for the periods March 29, 2003--April 6, 2003; July 18, 2003-- July 27 2003; August 20, 2003--September 2, 2003; July 24, 2004--August 1, 2004; August 11, 2004--August 18, 2004.  Plaintiff asserts that between these times she filled in for Emilio Palma and assumed additional clerical duties.  Although she did not raise this claim in the Complaint explicitly, she alleged that the Department's "practice of temporarily elevating [Plaintiff] to supervisory positions of increased responsibility and duties, without a commensurate increase...constituted gender discrimination." (Pl. Compl. at 8).  Thus, although she did not use the term "out of class pay," Plaintiff did raise this issue in her complaint, albeit not with specificity.

Plaintiff's claims from 2003, however, are barred by a two year statute of limitations. 29 U.S.C. § 255 provides that:

> Any action... to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938,
>
> (a) if the cause of action accrues on or after the date of the enactment of this Act [enacted May 14, 1947]--may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued;

-23-

29 USCS § 255.  Thus, ordinary violations of the Fair Labor Standards Act are subject to the general 2-year statute of limitations. To obtain the benefit of the 3-year exception, Plaintiff must prove that the employer's conduct was willful.  The issue then becomes whether the Department's violations were "willful."    As stated by the Supreme Court:

> [I]n common usage the word "willful" is considered synonymous with such words as "voluntary," "deliberate," and "intentional." The word "willful" is widely used in the law, and, although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent. The standard of willfulness-- that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute -- is surely a fair reading of the plain language of the Fair Labor Standards Act.

McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988).  In the instant case, Plaintiff has not alleged a "willful" violation of this Act, nor does this Court deem the Department's conduct in neglecting to pay Plaintiff "out of class" pay to be reckless.  First, other employees who performed additional duties did not receive out of class pay.   Second, the GSA contract provides that "Out of class pay is available only to an employee who is specifically authorized and assigned by the Department Director or designee to temporarily assume the duties of a higher pay status classification for five (5) consecutive workdays."  In the instant case, no Department Director assigned her to assume all of the duties of Emilio Palma.  Thus, the Department's alleged failure to pay Plaintiff out of class was not willful, and the 2 year statute of limitations applies.  29 USCS § 255.

With the statute barring most of Plaintiff's claims, only two weeks remain in dispute: July 24, 2004--August 1, 2004 and August 11, 2004--August 18, 2004.  Plaintiff argues that she is not governed by the GSA contract, but in her deposition contradicts her affidavit, acknowledging that she was aware she was governed by the contract.  (Pl. Dep. at 13-15).  "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material facts, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  Van T. Junkins & Assoc. v. U.S. Indus., 736 F.2d 656, 657 (11th Cir. 1984).  Nevertheless, a contract negotiated by the union binds all members of the unit, whether they are part of the majority or for that matter even members of the union.  Pryner v. Tractor Supply, 109 F.3d 354, 362 (7th Cir. 1997). See also Koenig v. Tyler, 360 So.2d 104, 106 (Fla. 3d DCA 1978) (Miami-Dade County employees "are bound by agreements made by the Union on their behalf.  To hold otherwise would make a shambles of all labor negotiations and would be a refutation of long experience in that field.").  So regardless of whether she perceived herself governed by the GSA, the fact remains that she was, at all relevant times, governed by the GSA, which specifically provides that "out of class pay is available only to an employee who is specifically authorized and assigned by the Department Director or designee to temporarily assume the duties of a higher pay status classification for five (5) consecutive workdays." (Def. Ex. 22, GSA Contract Art. 19).

As shown by the Payroll Records for the relevant period, July-August, 2004, (Def. Reply, p. 13), Plaintiff did not work five consecutive days while Palma was out, and was, thus, not eligible to receive "out of class pay" under the terms of the GSA Contract, to which she was bound.

Accordingly, the Department is entitled to summary judgment as to Count III.

<u>CONCLUSION</u>

In sum, Plaintiff has failed to produce any genuine issues of material fact sufficient to permit a reasonable jury to conclude that the Department discriminated against her on the basis of her sex or national origin.  Accordingly, for the foregoing reasons,

it is ORDERED and ADJUDGED that the Defendant's Motion for Summary Judgment as to all counts is GRANTED.

DONE and ORDERED in Chambers at Miami, Florida, this <u>8th</u> day of May, 2008.


SHELBY HIGHSMITH
UNITED STATES DISTRICT JUDGE


cc:    Counsel of record